WAYNE COUNTY BOARD OF ROAD COMMISSIONERS v GLS
LEASCO

Docket No. 55280. Argued October 9, 1974 (Calendar No. 13).—Decided May 27, 1975.

> The Wayne County Board of Road Commissioners brought condemnation proceedings against GLS LeasCo, Inc., to acquire additional land for Detroit Metropolitan Airport. A jury in Wayne Circuit Court, George T. Martin, J., returned a verdict of $160,000. The Court of Appeals, Quinn, P. J., and Danhof and V. J. Brennan, JJ., affirmed (Docket No. 15025). LeasCo appeals, asserting, among other errors, that it was denied a fair trial because of the improper conduct of the board's lawyer during trial and closing argument. *Held:*
>
> 1. The conduct of the board's lawyer, despite vigorous objection by LeasCo and continual admonitions by the trial court, in repeatedly belittling LeasCo's witnesses, accusing them without foundation of lying and of fabricating evidence, and taunting them, in attacking LeasCo's lawyer by suggesting that he bought testimony, and in appealing to the juror's self-interest as taxpayers, deprived LeasCo of a fair trial.
>
> 2. The test is not whether LeasCo can demonstrate prejudice

REFERENCES FOR POINTS IN HEADNOTES

[1] 75 Am Jur 2d, Trial §§ 193, 300, 307.
Counsel's appeal in civil case to self-interest of jurors as taxpayers, as ground for mistrial, new trial, or reversal. 33 ALR2d 442.

[2] 75 Am Jur 2d, Trial § 280.
Counsel's appeal in criminal case to racial, national, or religious prejudice as ground for mistrial, new trial, or reversal. 45 ALR2d 303.

[3] 27 Am Jur 2d, Eminent Domain § 425.
75 Am Jur 2d, Trial § 305.

[4] 75 Am Jur 2d, Trial § 193.

[5] 75 Am Jur 2d, Trial § 300.

[6] 27 Am Jur 2d, Eminent Domain § 448.
75 Am Jur 2d, Trial § 198.

[7] 75 Am Jur 2d, Trial § 79.

[8] 27 Am Jur 2d, Eminent Domain §§ 428–430.

[9] 27 Am Jur 2d, Eminent Domain §§ 418, 505.

[10] 27 Am Jur 2d, Eminent Domain § 477.

affirmatively. No litigant similarly situated can properly be expected to demonstrate affirmatively a prejudicial effect resulting from improper remarks of opposing counsel. The egregious and repetitive nature of the misconduct of the board's lawyer raises a substantial doubt about the fairness of the trial, and on the record presented the Court is not able to say that the jury was not diverted from the merits by repetitious aspersions, nor that the mischief done was cured by the judge's efforts.

3. Other questions raised which may arise on a new trial are:

a) A witness for the board, an engineer who had already testified and was known by the jury as an employee of the board, accompanied the jurors on a view of the property to provide information on the dimensions of the property and to answer questions. It was improper for him to mingle or converse with the jury, and because the effect on the jurors cannot be determined, the Court will not consider the impropriety harmless. On retrial, no employee of or witness for either party may so accompany the jury. If necessary, a person able to inform the jury about dimensions may join them at the site, upon notice to the parties and opportunity for them to send representatives, and upon request by a party the court reporter shall transcribe the colloquy.

b) The price paid for the property by LeasCo may not be admitted in evidence unless it is established by competent testimony that the physical and economic conditions of the property at the time of taking were similar to those at the time of purchase by LeasCo.

c) The instruction to the jury on fair market value should clearly and consistently state that in determining the fair market value the jury should consider any and all uses to which the property has been devoted or to which it may reasonably be adapted.

d) The Court is unable to review the trial court's exercise of discretion in allowances for expert witness fees, which LeasCo contends were inadequate, unless the trial court explains the basis of its allowances. This aspect of the litigation is remanded for fact finding and explanation, and further review may be by appeal to the Court of Appeals following disposition of the litigation by the trial court.

Reversed and remanded for new trial.

1. EMINENT DOMAIN—TRIAL—CONDUCT OF LAWYER—PREJUDICE—FAIR TRIAL.

   The improper conduct of a lawyer for a board of county road commissioners deprived a defendant of a fair trial in a condem-

nation proceeding where the lawyer, despite vigorous objection by defendant and admonition by the trial court, repeatedly belittled defendant's witnesses and lawyer by innuendo and unfounded accusation and made impermissible appeals to the self-interest of the jurors as taxpayers, and where the repetitive nature of these unwarranted attacks increased the probability of prejudice.

2. Trial—Fair Trial—Prejudice.

While a lawyer is expected to advocate his client's case vigorously, parties are entitled to a fair trial on the merits of the case, uninfluenced by appeals to passion or prejudice.

3. Eminent Domain—Witnesses—Expert Witnesses—Cross-Examination.

That the "battle of experts" in the just compensation issue of a condemnation proceeding is essentially a swearing match does not give counsel license to asperse the opponent's witnesses on cross-examination.

4. Witnesses—Personal Attacks—Unsubstantiated Insinuations.

Witnesses should not be subjected to personal attacks and unsubstantiated insinuations by ridicule and accusations of lying and manufacturing false evidence without foundation; each party is entitled to present its case on the merits, free from remarks of opposing counsel which may prejudice the jury and divert its attention from the real issues.

5. Eminent Domain—Jury—Prejudice—Taxpayers.

A lawyer representing a condemning authority may not exploit his position as representative of the taxpayers, including the jurors, to the detriment of the landowner by seeking to align the jurors as parties on the taxpayers' side.

6. Eminent Domain—Appeal and Error—Fair Trial—New Trial.

The improper conduct of a lawyer for a county board of road commissioners during trial and closing argument of a condemnation case in repeatedly attacking the landowner's witnesses and lawyer without basis was not harmless where, on the record, the Supreme Court cannot say that the jury was not diverted from the merits by the repetitious aspersions, nor could it say that the mischief done was cured by the judge's efforts; the defendant in such a case is in no position to "demonstrate affirmatively" that he did not have a fair trial, because it cannot be demonstrated what effect any particular statement has on a jury.

7. EMINENT DOMAIN—JURY VIEW—EMPLOYEES—WITNESSES—COURT
REPORTER—NOTICE.

No employee of or witness for either party in a condemnation
case should accompany the jury to the subject property or
mingle with them; if it be thought necessary to inform the
jurors regarding the dimensions of the property, a person able
to impart this information may join them at the site and both
parties should in all events be notified that such an explanation
will be given so that each may send a representative to the site
to observe the presentation and, if requested by either party,
the court reporter should transcribe the colloquy.

8. EMINENT DOMAIN—FAIR MARKET VALUE—EVIDENCE—PURCHASE
PRICE.

Before the price paid for property may be admitted in evidence in
a condemnation proceeding, the condemning authority must
establish by competent testimony that the physical and eco-
nomic conditions of the property at the time of the taking were
similar to those at the time the land was purchased by the
defendant; if the physical and economic conditions are not
similar, the price paid is not relevant to the fair market value
of the property at the time of the taking.

9. EMINENT DOMAIN—FAIR MARKET VALUE—INSTRUCTIONS TO JURY—
POSSIBLE USES.

The jury in a condemnation case should be instructed to deter-
mine the fair market value of the property at the time of the
taking not only with reference to the use to which it was then
applied, but also with reference to the uses to which it was
reasonably adapted.

10. EMINENT DOMAIN—WITNESSES—EXPERT WITNESS FEES—DISCRE-
TION.

A condemnation case is remanded for fact finding and explana-
tion of the computation of expert witness fees for the land-
owner, including a statement of hourly and daily rates of
compensation and of the number of hours of pretrial prepara-
tion and trial time allowed where the exercise of the circuit
court's discretion in fixing the amount of expert witness fees
cannot be reviewed unless the trial court explains the basis of
its allowances.

*John P. Cushman,* General Counsel, and *O.
George Fedrigo,* for plaintiff.

*Albert Green,* for defendant.

LEVIN, J. The Wayne County Board of Road Commissioners instituted condemnation proceedings against GLS LeasCo, Inc., to acquire land to expand and improve Detroit Metropolitan Airport.

The board's appraiser valued the property at $145,000. LeasCo's experts set the value at $740,000–$767,000. In closing argument, LeasCo's lawyer requested $750,000 for the property and an additional $750,000 for loss of use.

The jury returned a verdict of $160,000.

LeasCo claims error in (1) the denial of its motions for mistrial based on allegedly improper conduct of the board's lawyer during trial and closing argument; (2) the denial of its motion for mistrial after an employee of and witness for the board accompanied the jury to view the property; (3) the admission over objection of evidence of the purchase price of the property; and (4) the failure of the trial court to give a requested instruction regarding jury consideration of uses to which the property might reasonably be adapted.

LeasCo further contends that (5) the verdict was against the great weight of the evidence and (6) the expert witness fees allowed by the trial court were not adequate.

We find that improper conduct of the board's lawyer deprived LeasCo of a fair trial. Accordingly, we reverse. Our disposition makes it unnecessary to decide the other issues raised by LeasCo. However, because we remand for a new trial, we will address questions likely to arise again.

I

The Court of Appeals "disapprove[d] of the con-

duct and argument of plaintiff's counsel that was objected to", but affirmed the result because Leas-Co did "not demonstrate affirmatively prejudice" arising from the improper conduct.

LeasCo contends with some justification that "[t]o recite all such instances [of misconduct] would result in a restatement of the entire record of proceedings".

The board's lawyer, despite vigorous objection by LeasCo and admonition by the trial court, repeatedly belittled LeasCo's witnesses and lawyer by innuendo and unfounded accusation in an apparent effort to prejudice the jury. Additionally, he made impermissible appeals to the self-interest of the jurors as taxpayers.

While a lawyer is expected to advocate his client's cause vigorously, "parties are entitled to a fair trial on the merits of the case, uninfluenced by appeals to passion or prejudice".[1]

LeasCo's lawyer continually objected to the abusive questions and gratuitous remarks of opposing counsel. Not only were these objections consistently sustained, but the court often interjected on its own and reprimanded the board's lawyer.

The repetitive nature of these unwarranted attacks increased the probability of prejudice: "One attack [abusing opposing counsel] may not constitute prejudicial error, but where there are many improper remarks concerning counsel for the defense they may, in the aggregate, prove so prejudicial as to require a new trial."[2]

---

[1] *Layton v Cregan & Mallory Co, Inc,* 269 Mich 574, 583; 257 NW 888 (1934).

[2] 58 Am Jur 2d, New Trial, § 69, pp 258–259.

"An attack made upon opposing counsel in argument, which may at the outset have been harmless misconduct, may by repetition constitute reversible error." Anno: *Attack on Opposing Counsel—Prejudice,* 96 ALR2d 9, § 8, p 24.

This Court characterized as a "comedy of errors" a trial where counsel ignored the trial court's repeated admonitions regarding improper questions, arguments and disparaging remarks, and said: "As long as attorneys will resort to such methods, unjustifiable either in law or ethics,[3] courts have no alternative but to set the verdicts aside." *Atherton v Defreeze,* 129 Mich 364, 367; 88 NW 886 (1902).

Pertinent are the remarks of this Court in another condemnation case:

"While it is regrettable that this case must be sent back for retrial, with the costs and expenses incident thereto, yet it is of more importance that a cause be properly tried and that a verdict reflect and evaluate the rights of the interested parties." *In re Widening of Woodward Ave,* 297 Mich 235, 246; 297 NW 468 (1941).[4]

## II

### *A. Abusive Treatment and Unfounded Attacks on LeasCo's Witnesses*

The principal issue in most condemnation proceedings is the amount of "just compensation" for the land taken. Each side generally has its own appraisers testify and seeks to discredit the valuation made by its adversary. That this "battle of experts" is essentially a swearing match does not

---

[3] "Counsel have no right, either by direct charge or insinuation, to attempt to prejudice a jury against opposing counsel. Such conduct is not ethical and should not be permitted." *Levinson v Fidelity & Casualty Co of New York,* 348 Ill 495, 505; 181 NE 321, 325 (1932).

*See, generally,* Anno: *Prejudicial effect, in argument or summation in civil case, of attacks upon opposing counsel,* 96 ALR2d 9.

[4] *See McDonald v Champion Iron & Steel Co,* 140 Mich 401, 415; 103 NW 829 (1905):

"The purpose of lawsuits is to attain justice. The natural effect of such [highly prejudicial] statements is to defeat justice. The duty of courts is to so conduct trials that the ends of justice shall be reached."

give counsel license to asperse the opponent's witnesses on cross-examination.

One of LeasCo's appraisers was the target of particular abuse by the board's lawyer. He was belittled ("Look, I think it's time we quit the games"), accused of lying ("Your Honor, the man has been sitting here lying all morning") and sarcastically taunted ("I ask you directly, are you ashamed of yourself? * * * Well, spare me that. Will you spare me that. I heard that before * * * ").

Additionally, the board's lawyer repeatedly suggested that the appraiser's claim of lack of knowledge of certain matters was false: "It is indeed convenient for you that you don't know. * * * You give the impression you want to forget about them if you ever knew about them. * * * I know, you want to exclude a lot of things. * * * You predicated a very, very large opinion about a Class A road without knowing what it is."

A LeasCo executive was similarly ridiculed and accused of lying when he testified that LeasCo was entitled to $750,000:

"*Q.* Your last statement was $750,000?

"*A.* Yes.

"*Q.* Now, I presume that that needs to be added to some $800,000 testified to by Mr. MacDonald; is that right?

"*A.* I do not know what Mr. MacDonald testified to.

"*Q.* You seriously want us to believe that; that you don't know what Mr. MacDonald testified to?

"*A.* I was not present.

"*Q.* That has got to be the most incredible statement that I have ever heard in my life."

This witness also was belittled ("But you are a witness who has just coughed up the figure of

three quarters of a million dollars") and was accused of being dishonest in his responses.[5]

Two other expert witnesses testifying for LeasCo were accused of fabricating evidence. Of one, the board's lawyer asserted: "He came in here and built a big story on it." With the other, he was more direct: "He is testifying falsely again."

These comments represent more than the mere reproof of recalcitrant witnesses. They constitute unjustified, direct attacks on the integrity and honesty of LeasCo's witnesses. There is no evidence that these witnesses testified falsely, withheld information when stating that they did not know the answer to counsel's questions, or manufactured false evidence.

Witnesses should not be subjected to personal attacks and unsubstantiated insinuations. Each party is entitled to present its case on the merits, free from remarks of opposing counsel which may prejudice the jury and divert its attention from the real issues.[6]

---

[5] "We're talking about several millions of dollars and you want us to believe that Mr. Maroun [a stockholder of LeasCo] doesn't know what we're doing here?"

"You want this jury to believe that we in the court and the court and you and Mr. Green and Mr. Maroun have come all this distance and you sit there—we are talking a million and a half dollars at least —and you don't know what you want?"

"We are kind of foolish, then, aren't we here? * * * Isn't that kind of sad for a circuit court for the state of Michigan to sit here at this time seeking the truth, and we don't even know what Mr. Maroun wants?"

[6] "[R]emarks calculated to prejudice a jury are improper.

* * * It is the duty of lawyers to try their lawsuit to the end that justice may prevail. In our opinion, the remarks of counsel were of such a nature as to deflect the attention of the jury from the issues involved and had a controlling influence upon its verdict." *In re Widening of Woodward Ave*, 297 Mich 235, 246; 297 NW 468 (1941).

*See, also, Coan v Brownstown Twp*, 126 Mich 626; 86 NW 130 (1901); 58 Am Jur 2d, New Trial, § 74, p 265.

## B. Appeal to Jurors' Self-Interest as Taxpayers

A lawyer representing a condemning authority may not exploit his position as representative of the taxpayers, including the jurors, to the detriment of the landowner.[7]

A Texas appellate court ordered a new trial where the condemning authority's lawyer argued to the jury that as taxpayers they were "directly interested in this suit" and would pay any award "out of [their] own pockets." *West v State,* 150 SW2d 363, 364 (Tex Civ App, 1941).

In this case, the board's lawyer impermissibly sought to align the jurors as, in effect, parties on the taxpayers' side. During cross-examination of a witness he said, " * * * I don't want the people of the County of Wayne to get hurt any worse than they have to, I just wonder if you would consider taking over the airport, you know, call it even". The Court sustained LeasCo's objection, adding: "You are asking a question here that's really facetious * * * . I know that you wish to pursue aggressively, but there is a point where you stop." Board's lawyer: "But in all candor, your Honor, I think $10 million, I might as well give them the airport."[8] The Court: "That's argumentative."

In closing argument, the board's lawyer reiterated that the interests of his client and the public were identical: "We are making his property more

---

[7] *See* Anno: *Appeal to Jurors' Self-Interest,* 33 ALR2d 442–443.

[8] At other times the board's lawyer similarly inflated the amount of damages sought by LeasCo:

"I'm talking about the location he wants four million dollars for."

"Mr. Nyquist, are you saying that we should pay $3,524,000 for this 26 acres of property?"

valuable, the public is, and he wants us to pay him
for that."[9]

### C. Attacks on LeasCo's Lawyer and Suggestions that he "Bought" Testimony

The integrity of LeasCo's witnesses was further
impugned by the relentless attack on Albert
Green, LeasCo's lawyer. The lawyer for the board
repeatedly suggested that Green, together with
LeasCo executives, "bought" testimony.

In closing argument, the board's lawyer made
several unabashed assaults on Green:

"[LeasCo's] witnesses did not even know what after
value was. They never even thought about it. The
young man from Texas [an appraiser testifying for
LeasCo] didn't even know anything about that. Mr.
Green didn't tell him about that. * * * They just said
we'd like some pretty high figure for you to testify to.
* * *

"The only important thing for that young man to do
was to come up with a figure for Mr. Lech [a LeasCo
executive] and Mr. Green, a figure that they wanted,
and he obviously did that."[10]

---

[9] *Compare Denver Joint Stock Land Bank v Board of County
Commissioners of Elbert County,* 105 Colo 366, 368; 98 P2d 283, 285
(1940), where the lawyer representing the condemning authority
argued: "Any payment that is made to the respondents in this case
will come out of your own [the jurors'] pockets." Upon the landown-
er's objections, the trial court commented: "I have already instructed
the jury that arguments of counsel are not evidence." The Colorado
Supreme Court found that this admonition by the trial judge "under
the circumstances, was not sufficient to eliminate prejudice", and it
ordered a new trial.

*Similarly, see Doty v Jacksonville,* 106 Fla 1; 142 So 599, 601 (1932).

[10] *Compare Hillman v Detroit United Railway,* 137 Mich 184, 186;
100 NW 399 (1904), where plaintiff's lawyer improperly addressed the
jury:

"Are you gentlemen to be influenced by such testimony as this? Are
you to defeat the honest claim of a poor man, who comes before you
for justice, by a corporation that will resort to such lies and perjury to
maintain their case in this court."

*See, generally,* Anno: *Statements, comments, or conduct of court or
counsel regarding perjury, as ground for new trial or reversal in civil*

He also charged a LeasCo executive with shopping for an appraiser who would testify falsely to a high valuation figure.[11]

In a similar context, a New York Court said:

"Where, therefore, a lawyer, in his summation, charges that a witness testifying to material facts in a case has been 'bought' by the other side, when there is no basis in the evidence for any such charge, that statement is so highly objectionable and prejudicial as to require a new trial in a case involving sharply contested issues, particularly when the objectionable statement complained of was allowed to stand without prompt judicial rebuke." *Cohen v Covelli,* 276 App Div 375, 376; 94 NYS2d 782, 784 (1950).

The board's lawyer also accused LeasCo's lawyer of playing "tricks" on the jury,[12] "playing games",[13] and engaging in "distortion".[14]

Additionally, he stated that "Mr. Green's occupation was to make a lot of noise. * * * He has been screaming here for three weeks—let me explain—he is confusing everybody."[15]

---

action or criminal prosecution other than for perjury, 127 ALR 1385, 1421–1426.

[11] He posed the following as the approach used by the executive:
"I need a couple of high offers. I want to go downtown and tell the jury that property is selling at a fairly high figure. Don't you know about some high figures?"

[12] "[Green] can try all those tricks and he has tried all of them. He has not missed one."

[13] " * * * He is playing games."
"Your Honor, he hasn't had a witness yet who knew of his own knowledge. He is just playing games."

[14] "I don't know when he is going to stop his distortion, your Honor."

[15] In a letter to this Court dated October 15, 1974 (6 days after oral argument in this case), the board's lawyer wrote regarding the statement "Mr. Green's occupation was to make a lot of noise":
"I am certain the word occupation was incorrectly transcribed for client's business. We were talking about the noise that a trucking company would make."

A New Jersey Court reversed and remanded for a new trial where, in a summation to the jury that "far exceeded the bounds of proper comment and argument", the defense was described as being "replete with misleading red herrings" and "based on trickery, shameful conduct, and the pulling of 'stunts' ". *Tabor v O'Grady,* 59 NJ Super 330, 340–341; 157 A2d 701, 707 (1960).

### III

Ordering a new trial in *Hillman v Detroit United Railway,* 137 Mich 184, 187; 100 NW 399 (1904), this Court said:

"One cannot read the record without being impressed with the idea that the trial judge got tired of trying to keep counsel within the rules, and that counsel was not willing to acquiesce in the admonitions and suggestions of the court. The mischief done by the improper argument of counsel was not cured by the judge."

So, too, in this case "one cannot read the record without being impressed" that the board's lawyer refused to proceed solely on the merits.

The improper remarks directed at LeasCo's witnesses and lawyer demeaned them in the eyes of the jury. Whether those remarks were calculated to prejudice the jury or instead were innocent overzeal by the board's lawyer, they deprived Leas-Co of a fair trial. Irrelevant, disparaging and accusatory remarks divert the attention of the jury from the merits of the case. We appreciate that each side seeks to develop facts harmful to its opponent's case and endeavors in that sense to "prejudice" the jury to its own cause. There is, however, a limit to the excesses which will be

excused as zealous advocacy. When the improper conduct of a lawyer exceeds that limit, this Court will be "quick to condemn it in appropriate language."[16]

In a similar case this Court said:

"It would seem that after so many admonitions of this court counsel would begin to appreciate the point that this court will not allow a judgment to stand which has been obtained by the use of improper argument that has been prejudicial to the opposite party and not cured." *Spencer v Simmons,* 160 Mich 292, 297; 125 NW 9 (1910).

A substantial doubt regarding the fairness of the trial has been raised by the egregious and repetitive nature of the misconduct of the board's lawyer. On this record, we are not able to say that the jury was not diverted from the merits by the repetitious aspersions, nor could we say that the "mischief done" was cured by the judge's efforts. To say, as did the Court of Appeals, that LeasCo must "demonstrate affirmatively prejudice" is to misstate the test if not misplace the burden.

It cannot be demonstrated what effect any particular statement has on a jury. Neither LeasCo nor any other litigant similarly situated can properly be expected to "demonstrate affirmatively" a prejudicial effect on the jury resulting from improper remarks of opposing counsel.

We conclude that the error assigned is not harmless and LeasCo did not have a fair trial.

---

[16] "It is a matter of commendation for the bar generally that the number of cases is relatively few in which there have been unwarranted charges by counsel of misconduct on the part of opposing counsel, but where it has occurred the courts have been quick to condemn it in appropriate language." *Critcher v Rudy Fick, Inc,* 315 SW2d 421, 427 (Mo, 1958).

IV

The jury was transported by bus to view the subject property. An engineer for the board, who had already testified and was known by the jury as an employee of the board, accompanied the jurors to provide information regarding the dimensions of the property and to answer questions.

When LeasCo learned that the engineer had accompanied the jury on the bus, it moved for a mistrial. A separate record was made. The board's lawyer contended that no harm had been done. He argued that even though the engineer was an employee of the board, he was not in any partisan sense the board's witness because his testimony concerned only the dimensions of the subject property which were not in dispute.

The trial court denied LeasCo's motion.

While the engineer's testimony concerned only the dimensions of the subject property and was undisputed, he was nevertheless an employee of and witness for the board and the jury so identified him.

LeasCo need not show that the engineer was partisan. It need not demonstrate that his presence on the bus prejudiced the case. The effect his words, voice, facial expression or mere presence had on the jurors cannot be determined and this Court will not indulge the hypothesis that this impropriety was harmless. It is enough that he was a witness for the board and he did in fact mingle or converse with the jury.

On retrial, no employee of or witness for either party is to accompany the jury to the subject property. If it be thought necessary to inform the jury regarding the dimensions of the property, a person able to impart this information may join

them at the site. Both parties should in all events be notified that such an explanation will be given. Each may send a representative to the site to observe the presentation and, if requested by either party, the court reporter shall transcribe the colloquy.

## V

LeasCo objected to the admission of the price it paid for the subject property asserting that a proper foundation had not been established.

On retrial, before the price paid may be admitted in evidence, the board must establish by competent testimony that the physical and economic conditions of the property at the time of the taking were similar to those at the time the land was purchased by LeasCo.

"The elapse of time coupled with economic and physical changes affecting the property are the factors to be considered. [Citations omitted.] Where substantial fluctuation of economic and physical conditions occur then the original purchase price may not be a fair reflection upon present value of the condemned land." *State Highway Commission v McGuire,* 29 Mich App 32, 34; 185 NW2d 187 (1970).

If the physical and economic conditions are not similar, the price paid is not relevant to the fair market value of the property at the time of the taking.

The second clause of the instruction on fair market value appears inconsistent with the first clause and the jury could easily have been confused.

On retrial, the instruction should clearly and consistently state that in determining the fair

market value the jury should consider any and all uses to which the property has been devoted or may reasonably be adapted. The jury should be instructed to determine the fair market value of the property at the time of the taking not only with reference to the use to which it was then applied, but also with reference to the uses to which it was reasonably adapted.

Lastly, LeasCo contends that the trial court's allowances for expert witness fees to be paid by "the petitioner" are inadequate.

This condemnation proceeding was commenced under 1911 PA 149[17] which provides that witnesses "shall be entitled to receive from the petitioner the same fees and compensation as are provided by law for similar services in an ordinary action at law in the circuit courts" and which authorizes the judge to order payment of a reasonable attorney's fee, not exceeding $25, which may be taxed with the costs.[18]

This Court has held in a proceeding under this act "that defendants' expert witnesses shall be entitled to receive their ordinary witness fees or such larger sum in excess thereof as the circuit court awards, as in ordinary actions at law in circuit courts, which may be taxed" with the costs. *Department of Conservation v Connor,* 321 Mich 648, 653; 32 NW2d 907 (1948).

"While fixing the amount of expert witness fees is left, under the act, to the sound discretion of the circuit court" *(Department of Conservation v Connor, supra),* we are unable to review the exercise

---

[17] MCLA 213.21 *et seq.;* MSA 8.11 *et seq.*

[18] MCLA 213.37; MSA 8.27.

This Court has held that the Legislature has the authority to fix the maximum attorney's fee to be paid by the petitioner in proceedings under this act at $25 and that the circuit court was without authority to award a fee of $1,250. *Muskegon v Slater,* 379 Mich 466; 152 NW2d 652 (1967).

of that discretion unless the trial court explains the basis of its allowances.

We remand this aspect of this litigation for fact finding and explanation, including a statement of the hourly and daily rates of compensation and of the number of hours of pretrial preparation and trial time allowed as to each witness. Further review of this issue may be obtained by an appeal to the Court of Appeals following the disposition of the litigation by the trial court.

We reverse and remand for a new trial. Costs to appellant.

T. G. KAVANAGH, C. J., and WILLIAMS, M. S. COLEMAN, and J. W. FITZGERALD, JJ., concurred with LEVIN, J.

SWAINSON, J., and the late Justice T. M. KAVANAGH took no part in the decision of this case.